**FOR PUBLICATION**                                                          **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

ISAAC PEARSON,                          :
                                        :
                    Plaintiff,          :
                                        :
        v.                              :          **OPINION**
                                        :          **Civ. Action No. 04-2237 (WHW)**
JO ANNE B. BARNHART                     :
COMMISSIONER OF SOCIAL SECURITY,        :
                                        :
                    Defendant.          :
                                        :

---

Walls, District Judge

        Plaintiff Isaac Pearson seeks review of the final determination of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits and supplemental security income pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  This Court will reverse the Administrative Law Judge's ("ALJ") decision to deny benefits and remand the case to the Commissioner for further proceedings.


## BACKGROUND

### A.  Procedural History

        Plaintiff applied for disability insurance benefits and supplemental security income payments on March 20, 2002.  (Tr. 48-51, 172-184).  The application was denied initially and upon reconsideration.  (Tr. 23-24, 27-32, 34-36).  At plaintiff's request, a hearing was held to review the application before an administrative law judge ("ALJ") on August 26, 2003.  (Tr. 39-41, 187-209).  The ALJ affirmed the decision of the Commissioner on September 9, 2003.  (Tr.

FOR PUBLICATION                                                    CLOSED

14-22).  The ALJ determined that plaintiff suffered from a severe impairment and did not retain

the ability to return to his past work.  (Tr. 18-21).  However, plaintiff was found to have the

residual functional capacity to perform other jobs within the national economy which involve

"light work," as defined by the Dictionary of Occupational Titles.  (Tr. 20-21).  The ALJ also

concluded that plaintiff's statements concerning his impairment and its impact on his ability to

work were not credible.  (Tr. 20).  Plaintiff's request for an appeals council review of the

determination was denied on April 9, 2004, and the ALJ's decision became the final decision of

the Commissioner.  (Tr. 6-8).  Plaintiff timely commenced this action.


**B.  Personal and Employment History**

Pearson was forty-seven years old at the alleged onset of his disability and fifty years old

at the time of the ALJ's decision.  (Tr. 190).  He testified that he had a seventh-grade education.

Id.  However, in his disability report,[1] Pearson indicated that he had attended school up to the

tenth grade.  (Tr. 64).  Pearson is six feet, four inches tall and weighs 170 pounds.  (Tr. 194).  He

alleged that he had lost twenty pounds as a result of being restricted to a liquid diet because of a

stomach condition.  (Tr. 194-95).

Pearson worked as a groundsman at a golf course from 1979 until November 2000.  (Tr.

59, 190-92).  This job involved mowing the grass, spraying chemicals, picking up leaves,

shoveling snow and frequently lifting one hundred pound bags of fertilizer.  (Tr. 59).  He walked

for one hour, stood for one hour, and sat for six hours.  Id.  Pearson underwent back surgery in

1992. (Tr. 192).  After the surgery, he no longer lifted the fertilizer bags at work.  (Tr. 59).  He

---

[1] A disability report is filled out by the plaintiff as part of the application for disability benefits.

also stated in his disability report that he received workers' compensation for one or two months per year, but further information about the nature of this compensation is absent from the record. (Tr. 58).  Pearson was fired in 2000 and has not returned to work.  Id.  He stated that he had stopped working because new management at the golf course laid him off.  Id.  In addition, because of his injuries, age, and career experience he felt limited in his work choices.  Id.

Pearson claims that he had back pain, leg pain, and numbness from his hips to his feet. (Tr. 195).  In order to relieve his pain, he relied on an over-the-counter medication, Aleve, until his doctor informed him that Aleve could cause ulcers.  (Tr. 193).  In his disability report, Pearson stated that he went to a medical clinic whenever he experienced back pain.  (Tr. 60). The doctors at the clinic examined and x-rayed his back and generally prescribed muscle relaxers and pain medication.  Id.

Pearson testified that he can sometimes walk up to two blocks at a time, but at other times he can not even straighten out his back.  (Tr. 195, 205).  He also said he can continuously stand or sit for as long as twenty minutes, or lift a jug of milk, but he can not bend or stoop down.  (Tr. 205-206).  At the hearing, Pearson asserted that he had previously fractured his dominant left hand, and that it still hurt occasionally.  (Tr. 199-200).  However, he did not indicate any problems with his hands in his disability report.  (See Tr. 58).

In 2002, Pearson's gallbladder was removed.  (Tr. 192; see Tr. 98).  Before the operation, he had treated his stomach pain with baking soda.  (Tr. 193).  As a result, his stomach swelled and he required gallbladder surgery.  Id.  Although he received healthcare from a charitable organization after the surgery, he claims that he still had constant pain.  (Tr. 193-195). Additionally, Pearson complained of a swollen liver.  (Tr. 192).  Due to his lack of health

**FOR PUBLICATION**                                                    **CLOSED**

insurance, he did not see his doctor nor did he have any prescriptions filled since the gallbladder

surgery.  (Tr. 79, 193, 194).

Pearson complained of hypertension which affected his eyes, aorta, and caused a right

bundle branch block.[1]  (Tr. 201).  Initially, he treated his hypertension with vinegar and garlic

pills.  (Tr. 80).  He was later prescribed medication from his doctor that alleviated his

hypertension. (Tr. 194, 202).

Pearson testified that he currently resides with his fiancee and that she handled all of the

couple's cooking, cleaning, laundry, and shopping.  (Tr. 204).  He testified that he generally

stayed at home, but attended church on Sunday and occasional family functions.  (Tr. 204-205).


**C.  Medical History**

**1.  Summary of Medical Evidence Before the Alleged Onset Date of Disability**

On March 8, 1990, Dr. Edward Decter, an orthopedist, examined the plaintiff and noted

that he had been recovering for two weeks from a laminectomy[2] and a L5-S1 discectomy[3].  (Tr.

84).  Plaintiff told his doctor about his history of  back pain that started in 1987 after lifting

something heavy at work.  Id.  The pain was exacerbated after plaintiff was involved in a car

---

[1]  A bundle-branch block occurs within a ventricle of the heart.  STEDMAN'S MEDICAL
DICTIONARY 213 (26th ed. 1995).  It is an interruption of conduction in one of the two main
branches of the artrioventricular bundle.  Id.

[2]  A laminectomy is a surgical operation in which the posterior arch of the spine is removed.  Id.
at 934.

[3]  A discectomy is the removal, in part or whole, of a disk which is interposed between adjacent
vertebrae.  Id. at 491.  "L5-S1" is the medical shorthand for the fifth vertebra of the lumbar
region and the first vertebra of the sacrum region of the spine.  See Id. at 1028.

accident in January 1989.  Id.  Plaintiff stated that after the laminectomy and discectomy, the leg pain was much improved but he still had occasional pain in his back.  Id.

On April 6, 1990, Dr. Decter determined that plaintiff was doing well, and he was discontinued from active orthopedic care.  Id.  On January 11, 1991, Dr. Decter noted that plaintiff was recovering from a laminectomy at L5 -S1.  Id.  The doctor prescribed Naprosyn and recommended a short course of physical therapy.  Id.  On October 22, 1991, plaintiff indicated to Dr. Decter that he was feeling pain in the left side of his lower lumbosacral spine, which occasionally radiated down into the left calf.  (Tr. 83).  The doctor recommended more physical therapy and advised plaintiff not to do any heavy lifting or bending.  Id.  Dr. Decter also prescribed plaintiff Naprosyn and Flexeril.  Id.

On February 19, 1993, plaintiff complained of pain in his right lower lumbosacral spine, which developed while he was shoveling snow.  (Tr. 84).  Dr. Decter detected no radicular component[4] in the plaintiff and found that his neurological status was unchanged.  Id.  The doctor prescribed Medrol and Vicodin and recommended bed rest.  (Tr. 84-85).

Plaintiff reported an increase in pain in his left leg on March 8, 1993.  (Tr. 83).  Dr. Decter ordered electromyograms ("EMGs") and a magnetic resonance imaging ("MRI") scan of plaintiff's lower extremities.  Id.  The doctor placed plaintiff on Alterpak and recommended physical therapy.  Id.

On March 22, 1993, Dr. Decter noted that plaintiff was feeling much better.  (Tr. 83).  The EMGs showed a L5-S1 root level radiculitis[5] on the left side.  Id.  Plaintiff's MRI scan

---

[4]  A radicular component would indicate that something was affecting the nerve fibers, which form nerves, in the spine.  STEDMAN'S MEDICAL DICTIONARY 1484 (26th ed. 1995).

[5]  Radiculitus is a "disorder of the spinal nerve root."  Id. at 1484.

<u>FOR PUBLICATION</u>                                                  **CLOSED**

revealed some scarification and possibly a recurrent residual disk herniation[6] at L5-S1.  <u>Id.</u>  The doctor concluded that no surgery was necessary, but he recommended more physical therapy. <u>Id.</u>

### 2.  Summary of Medical Evidence After the Alleged Onset Date of Disability

Plaintiff was admitted to Newark Beth Israel Medical Center ("Beth Israel") on March 10, 2002.  (Tr. 88).  The attending physician noted that plaintiff complained of a pain in his upper right abdomen that had radiated to his back, a swollen right upper abdomen, nausea, and constipation.  (Tr. 90).  Plaintiff had no fever, diarrhea, or melena.  <u>Id.</u>  He claimed that his weight had dropped from 195 pounds to 170 pounds during the previous six months.  (Tr. 100). The doctor observed that plaintiff's blood pressure was 144/85, and that his heart sounds were normal.  (Tr. 88).  The doctor also observed that plaintiff was in mild distress, and that his liver was slightly enlarged.  (Tr. 92).  However, he had no rebounding, spasms of his abdominal muscles, or tenderness of the ribs or thoratic vertibrae.  <u>Id.</u>  A computed tomography scan of plaintiff's abdomen revealed a very distended gallbladder and dilated common bile duct ("CBD").  (Tr. 89).  An ultrasound showed a 10 X 5 centimeter (cm.) gallbladder length, with multiple 2 cm. stones and a 2.8 cm. CBD.  <u>Id.</u>  A magnetic resonance cholangiopancreatography revealed stones in plaintiff's gallbladder and marked dilation of the CBD.  <u>Id.</u>

---

[6]  A herniated disk is a protrusion of a degenerated or fragmented intervertebral disk into one of the openings in the vertebral canal with potential compression of a nerve root or into the spinal canal with potential compression of the bundle of nerve roots located below the first lumbar. STEDMAN'S MEDICAL DICTIONARY 506, 674, 294 (26th ed. 1995).

**FOR PUBLICATION**                                                    **CLOSED**

The doctor's preoperative diagnosis consisted of obstructive jaundice[7], inflammation of the gallbladder, CBD stones, and gallstones.  (Tr. 88).  Plaintiff was scheduled for surgery to remove his gallbladder, CBD exploration, and removal of stones from his CBD.  (Tr. 98).

On March 19, 2002, the surgery was successfully performed and the stones were removed without any complications.  (Tr. 98-99).  Plaintiff was discharged on March 25, 2002, with staples in place.  (Tr. 88-89).  He was prescribed a pain medication.  (Tr. 89).  The doctor advised plaintiff to return in one week for removal of the staples, which the plaintiff did.  (Tr. 89, 143).

On April 25, 2002, Dr. John M. Augustin, a consultative physician, conducted a medical examination of plaintiff on behalf of the Commissioner.  (Tr. 144-48).  Dr. Augustin noted that plaintiff complained of low back pain and a tingling or burning sensation within his lower extremity.  (Tr. 144).  Plaintiff informed the doctor that he was not taking any prescription medication, but was taking over-the-counter Aleve for pain and vinegar with water to control his hypertension.  (Tr. 145).

Dr. Augustin observed that plaintiff's blood pressure was 130/80, and his respirations were 20 per minute.  (Tr. 145).  Without eyeglasses, plaintiff's vision in his right eye was 20/25 while vision in his left eye was 20/40.  Id.  An examination of the interior of plaintiff's eye showed atherosclerotic changes[8].   Id.   Plaintiff's ears, nose and throat disclosed no

---

[7]  Jaundice is the "yellowish staining" of the skin, eyes and other tissues.  STEDMAN'S MEDICAL DICTIONARY 903 (26th ed. 1995).  Obstructive jaundice results from blockage to the flow of bile into the duodenum.  Id. at 904.

[8]  Atherosclerotic changes denote damage to the walls of the arteries and the resulting accumulation of plaque at the site where the damage occurred.  Id. at 162.  The build-up of plaque may ultimately cause blockage or stoppage of blood flow.  Id.  Plaintiff's hypertension was a probable cause of the damage to the walls of his arteries.  See id.

abnormalities, his neck was supple with no enlargement of the thyroid gland or engorgement of the jugular vein and no bruits[9].   Id.   His chest was symmetrical with normal respiratory expansion, and his lungs sounded clear when listened to.   Id.   His heart had a regular sinus rhythm with no murmurs, splits, gallops or enlargement.   Id.   His abdomen was soft, nondistended, and his liver, spleen and kidneys were not palpable.   Id.   Straight leg raising when plaintiff was lying on his back was to 80 degrees on the right and to 75 degrees on the left.   Id. Straight leg raising in the sitting position was to 60 degrees on the right and to 40 degrees on the left.   Id.   Plaintiff walked without a cane and was able to walk on his heels and toes.   Id. Plaintiff's lower extremities disclosed no sensory or motor deficits, nor any edema[10] or varicose veins.   Id.   His cranial nerves, deep tendon reflexes, and vibrations were normal.   Id.

A chest x-ray showed that plaintiff's aorta was atherosclerotic, and his heart size was normal with a cardiothoracic ratio of fifty percent.   (Tr. 145).   There was some blunting of the right costophrenic angles[11] and plaintiff's lungs showed signs of emphysema.   Id.   An electrocardiogram revealed a normal sinus rhythm.   Id.   All complexes and intervals were normal, and there was a regular sinus rhythm prime pattern in leads V1 and V2, which suggested a right bundle branch.   Id.   Plaintiff's body chemistries and complete blood count were all within normal limits.   (Tr. 145-46; see Tr. 148).   Dr. Augustin opined that plaintiff was recovering well from the surgery in which his gallbladder was removed.   (Tr. 146).

---

[9]  A bruit is an abnormal sound which is heard when a physician listens to the body as a diagnostic method.  Id. at 246, 169.

[10]  Edema is "an accumulation of an excessive amount of watery fluid in cells [or] tissues."  Id. at 544.

[11]  "Costophrenic angles" is the term used to describe the recesses between the ribs and the diaphragm, as they appear on a chest x-ray.  Id. at 88, 1700, 1485.

Dr. R.T. Walsh, a state agency medical consultant, completed a physical residual functional capacity assessment on June 25, 2002. (Tr. 151-58). Dr. Walsh determined that during an eight-hour workday plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk for about six hours and sit less than six hours. (Tr. 152). Plaintiff was not limited in his ability to push and/or pull. Id. His balance was occasionally limited, and his climbing, stooping, kneeling, crouching and crawling were frequently limited. (Tr. 153). Dr. Walsh reviewed the clinical findings of Dr. Augustin, including plaintiff's clear lungs and the absence of organomegaly.[12] Id. Plaintiff's straight leg raising was to 80 degrees on the right and 75 degrees on the left. Id. Plaintiff did not have manipulative, visual, communicative, or environmental limitations. (Tr. 154-55). Dr. Walsh noted that the majority of these findings were consistent with the conclusions of plaintiff's treating and examining doctors. (Tr. 157).

On September 19, 2002, Dr. John M. Sawicki, a consultative physician, conducted an examination of plaintiff. The doctor reported that plaintiff complained of low back pain, and pain that extended from his left hip down to his left knee. (Tr. 160). Plaintiff complained of problems bending, lifting, standing, twisting, sitting, and walking. Id. Plaintiff also told Dr. Sawicki that he could sit or stand for one hour. Id. The doctor noted that plaintiff's gait was slow, but he walked at a reasonable pace and without any assistive device. (Tr. 161, 164). Dr. Sawicki also noted that plaintiff's position transfers, dressing, and undressing were slow. (Tr. 161).

---

[12] Organomegaly is the abnormal swelling of one or more of the organs of the digestive, respiratory, urogenital, and endocrine systems as well as the heart, spleen and great vessels. STEDMAN'S MEDICAL DICTIONARY 1257, 1948 (26th ed. 1995).

Dr. Sawicki observed that plaintiff's blood pressure was 150/90, his pupils were equal and reactive to light and the his cranial nerves were mostly intact.  Id.  Plaintiff's cervical spine revealed no tenderness, his range of motion ("ROM") to flexion/extension was to 30 degrees, and to rotation it was to 70 degrees bilaterally.  (Tr. 161; see Tr. 164).  Plaintiff complained of pain along the lumbar region of his spine.  Id.  His lumber spine ROM to flexion/extension was to 60 degrees and lateral flexion was to 15 degrees bilaterally.  Id.  Plaintiff squatted and stood on his toes and heels.  (Tr. 161).  He had full muscle strength at grade 5/5.  Id.  Seated straight leg raising was to 70 degrees, and negative bilaterally.  (Tr. 161; see Tr. 164).  He had full ROM in the shoulders, elbows, and wrists.  (Tr. 161; see Tr. 163).  Plaintiff's grip strength and pinch strength were full at grade 5/5.  (Tr. 161; see Tr. 164).  His bilateral triceps and biceps reflexes were normal.  (Tr. 161).  He had full ROM in his hips in forward flexion, backward extension, abduction and adduction.  (Tr. 161; see Tr. 163).  Plaintiff's internal rotation was to 30 degrees bilaterally, and external rotation was to 40 degrees bilaterally.  Id.  Plaintiff's ankles had a full ROM and his patellar and Achilles reflexes were within normal limits.  (Tr. 161).

On November 17, 2002, a second state agency medical consultant reviewed Dr. Walsh's assessment.  (Tr. 167-69).  He concurred with Dr. Walsh's evaluations of plaintiff's postural, manipulative, visual, communicative, and environmental limitations, but disagreed with his assessment of plaintiff's exertional limitations.  (Tr. 168).  Ultimately, the medical consultant affirmed Dr. Walsh's determination that plaintiff was not disabled.

The medical consultant was unable to determine a reason for Dr. Walsh's finding that plaintiff was limited to sitting for less than six hours.  (Tr. 168).  The state medical consultant opined that due to a positive straight leg raising test while seated, plaintiff was given a limitation on sitting.  Id.  The state medical consultant stated that such a limitation was incorrect because

the straight leg raising test while seated makes no implications about the act of sitting.  Id.  The medical consultant agreed with Dr. Walsh's assessment of plaintiff's postural limitations and that plaintiff could lift fifty pounds occasionally and stand for six hours.  (Tr. 169).  However, while Dr. Walsh determined that plaintiff could lift twenty-five pounds frequently, the medical consultant found that plaintiff could only lift ten pounds frequently.  Id.  He concluded that plaintiff had a good recovery from his laminectomy, since he did not visit Dr. Decter for the following two years.  Id.  Plaintiff only returned to Dr. Decter two years later due to a non-radiating low back pain which resulted from shoveling snow.  Id.

## STANDARDS

### A.  Standard of Review

This Court has jurisdiction to review the final Commissioner decision under 42 U.S.C. § 405(g).  The district court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g); Stunkard v. Sec'y of Health & Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d. 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court is not "empowered to weigh the evidence or substitute its conclusion for those of fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

**FOR PUBLICATION**                                                               **CLOSED**

    In considering whether there is substantial evidence to support the Commissioner's decision, the reviewing court must examine: "(1) objective medical facts; (2) diagnoses and expert opinions of treating and examining physicians; (3) subjective evidence of pain; and (4) the claimant's educational background, work history and age."  Snee v. Sec'y. of Health & Human Services, 660 F.Supp. 736, 738 (D.N.J. 1987) (quoting Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972)).  Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion.  See Blalock, 483 F.2d at 775.


**B**.  **Standard for the Commissioner's Determination of Disability**

    To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); See also Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  The Social Security Act (the "Act") provides that:

> [an individual] shall be determined to be under disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A).

    "In accordance with authority granted under 42 U.S.C. § 405(a), the Commissioner has promulgated the regulations applied by the ALJ to give effect to, and

further define the provisions of the Act." Knepp, 204 F.3d at 83.  The regulations

provide for a five-step evaluation of an individual's claim for disability and supplemental

security income benefits.  See Sullivan v. Zebley, 493 U.S. 521, 525, 110 S.Ct. 885, 888-

89, 107 L.Ed.2d 967 (1990); see also Knepp, 204 F.3d at 83; Schaudeck v. Comm'r of

Social Security Admin., 181 F.3d 429, 431-32 (3d Cir. 1999).

   In step one, the ALJ must determine whether the claimant currently engages in

substantial gainful activity. 20 C.F.R. §§ 404.1520(a) (1999); 20 C.F.R. §§ 407.1572,

416.972 (1999).  If the claimant is not engaged in substantial gainful activity, the claim

analysis proceeds to step two.

   In step two, the ALJ determines whether the claimant suffers from a severe

impairment or combination of impairments, which significantly limits the claimant's

physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c) and

416.920(c); see also Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982).  The burden

is on the claimant to prove that his impairments are sufficiently severe to satisfy the

standard.  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96

L.Ed.2d 119 (1987).

   In step three, the ALJ must determine "whether the impairment is equivalent to

one of a number of listed impairments that the Commissioner acknowledges are so severe

as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141, 107 S.Ct. at 2291.

"If the impairment meets or equals one of the listed impairments, the claimant is

conclusively presumed to be disabled."  Id.; see also 20 C.F.R. §§ 404.1520(d),

414.920(d).  If a claimant does not suffer from a listed impairment or its equivalent, the

analysis proceeds to steps four and five, where the ALJ "must determine whether the

claimant retains the ability to perform either his former work or some less demanding employment."   Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).

In step four, the claimant must establish that he or she lacks the "residual functional capacity" to return to his or her former work.  20 C.F.R. §§ 404.1520(e); see also Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). "Residual functional capacity" is defined as what the claimant "can still do despite [his or her] limitations."  20 C.F.R. §§ 404.1545(a).  An ALJ must evaluate the physical and mental requirements of the claimant's past work experience to determine residual functional capacity.  See 20 C.F.R. §§ 404.1520(e); see also Knepp v. Apfel, 204 F.3d 78, 82 (3d Cir. 2000).  If the claimant can meet his or her past work demands, then he or she is not disabled within the meaning of the Act.  See Yuckert, 482 U.S. at 141, 107 S.Ct. at 229.

In step five, the Commissioner must show that the claimant, given his or her age, education, and work experience, has the capacity to perform specific jobs that exist in the national economy.  See 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may rely on medical-vocational guidelines, commonly known as "Grids," such as those contained in 20 C.F.R. Subpart P, Appendix 2 for purposes of establishing whether a sufficient number of jobs exist for a person with claimant's diminished capacity.  See Heckler v. Campbell, 461 U.S. at 460, 103 S.Ct. at 1954.  Plaintiff bears the burden of proof for the first four steps of the analysis, and the Commissioner bears the burden for the fifth step.  See Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

**FOR PUBLICATION**                                                      **CLOSED**


## ANALYSIS

In steps one and two of the analysis, the ALJ concluded that plaintiff was not engaged in substantial gainful activity and that his status after the laminectomy, discectomy L5-S1, and gallbladder removal did constitute severe impairments.  (Tr. 18-19).  However, at the third step of analysis, the ALJ found that none of plaintiff's impairments (either alone or in combination) satisfied or equaled the clinical criteria listed in appendix 1 of the regulations.  (Tr. 19).  Because plaintiff's impairments did not meet or equal the criteria listed in appendix 1, a determination of *per se* disability was not merited.  See 20 C.F.R., Part 404, Sub. P, App. 1.  The analysis then proceeded to step four, where the ALJ found that plaintiff established that he lacked the "residual functional capacity" to perform his "past relevant work."  (Tr. 19-20).  The ALJ found that plaintiff still had the residual functional capacity to perform light work.  (Tr. 20-21). As a result of this finding, the ALJ determined that a sufficient number of jobs within the national economy fell within the category of light work and were capable of being performed by the plaintiff.  Id.

Plaintiff challenges the ALJ's decision on two grounds.  First, plaintiff alleges that the ALJ failed to perform a proper assessment of the plaintiff's work-related abilities.  (Pl.'s Br. at 6).  Plaintiff claims that the ALJ did not refer to medical evidence when explaining his finding on plaintiff's residual functional capacity.  Id.  Second, plaintiff asserts that the ALJ failed to evaluate properly the plaintiff's subjective complaints.  Id.

**FOR PUBLICATION**                                                         **CLOSED**

**1.     The ALJ Failed To Conduct a Proper Residual Functional Capacity Determination Under the Requirements of SSR 96-8p.**

Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairments.  20 C.F.R. §§ 404.1545(a) and 416. 945; see Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (citing Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir.1999)).  Determination of a claimant's residual functional capacity is the exclusive responsibility of the ALJ.  20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), and 416.946.

Plaintiff argues that the ALJ violated Social Security Rule ("SSR") 96-8p in his assessment of plaintiff's residual functional capacity.  (Pl.'s Br. at 5-6).  SSR 96-8p states that "the [residual functional capacity] is a function-by-function assessment based on all of the relevant evidence of an individual's ability to do work-related activities." Specifically, under this rule, the ALJ is required to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  SSR 96-8p.  Moreover, such a discussion must be made by the ALJ in narrative form, "citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p.

Under this rule, plaintiff's first argument is that the ALJ's residual functional capacity assessment was conclusory.  (Pl.'s Br. at 5).  Specifically, plaintiff alleges that

the ALJ failed to explain in his opinion the medical evidence which he considered in determining the residual functional capacity.  Id. at 5-6.

Plaintiff's argument has merit.  The Tenth Circuit ruled the ALJ must "specify the evidence that he relied upon to support his [or her] conclusion" in order to meet the requirement of SSR 96-8p.  Diggdon v. Apfel, 1999 U.S. App. LEXIS 19248 at *8 (10th Cir. Aug. 16, 1999).  In addition, this requirement is not satisfied by the ALJ's mere assertion that the residual functional capacity was based on the medical evidence.  Id. Instead, SSR 96-8p requires the ALJ to cite *specific* medical facts that support his or her residual functional capacity determination.  Southard v. Barnhart, 72 Fed. Appx. 781 at *784 (10th Cir. July, 28, 2003).  If an ALJ fails to cite the specific medical facts that he relied on in making a residual functional capacity determination, the reviewing court may not make factual determinations on behalf of the ALJ.  See Cox v. Apfel, 1999 U.S. App. Lexis 25630 at *9 (10th Cir. October 14, 1999); See also Rapp v. United States Dep't of Treasury, 52 F.3d 1510, 1515 (10th Cir. 1995) (stating that a reviewing court may not compensate for the deficiencies in an agency's decision "by supplying a reasoned basis for the agency's action that the agency itself has not given.").  Although in Rinker v. Barnhart, another district court in this circuit concluded that an ALJ's mere consideration of the plaintiff's exertional impairments is sufficient to satisfy the requirements of SSR 96-8p, this Court is persuaded by and will follow the teachings of the Tenth Circuit as described above.  See Rinker, 2004 U.S. Dist. LEXIS 11358 at *19 (E.D.Pa. May 28, 2004).  This Court determines that to do otherwise would render SSR 96-8p meaningless.

Although it does not specifically address the requirements of SSR 96-8p, the

Third Circuit caselaw is consistent with the Tenth Circuit's position on this issue.  In

Fargnoli v. Halter, the court of appeals concluded that the ALJ's residual functional

capacity assessment must "be accompanied by a clear and satisfactory explanation of the

basis on which it rests."  247 F.3d 34, 41 (3d Cir. 2001). This type of explanation

facilitates a meaningful judicial review and "helps to avoid judicial usurpation of

administrative functions."  Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

In responding to plaintiff's arguments, the Commissioner argues  that the ALJ

properly discharged his obligations under SSR 96-8p.  The Commissioner claims that the

ALJ considered the medical evidence provided by Dr. Sawicki and Dr. Augustin in

assessing the plaintiff's residual functional capacity and that the ALJ referred to this

evidence in his opinion.  (Def.'s Br. at 16-17).  This argument is not supported by the

record.  The ALJ only refers to the medical evidence provided by the two doctors during

step two of the five-step disability evaluation process.  The ALJ fails to make any

reference to the medical evidence in his assessment of plaintiff's residual functional

capacity.  (Tr. 19; See Tr. 20).

The Commissioner also asserts that the findings of Dr. Walsh, a state agency

medical consultant, support the ALJ's finding of residual functional capacity.  (Def's Br.

at 15-16).  The Commissioner further states that the ALJ is "entitled to rely upon the

opinions of [state agency medical consultants] issuing decisions."  Id. at 16.  Even if

Commissioner's assertions are true, this argument fails because the ALJ neither

mentioned the findings of Dr. Walsh in his assessment of plaintiff's residual functional

capacity nor anywhere else in his opinion.  (See Tr. 17-21).

       Plaintiff also appears to argue that the ALJ did not properly identify plaintiff's

functional limitations and assess his work-related abilities on a function-by-function

basis.  (Pl.'s Br. at 6).  Particularly, SSR 96-8p requires the ALJ to assess the following

functions: sitting, standing, walking, lifting, carrying, pushing, pulling, and, if applicable,

manipulative or postural functions, such as reaching, handling, stooping, or crouching.

See 20 C.F.R. 404.1545, 416.945.   Moreover, plaintiff appears to argue that, as part of

this functional assessment, SSR 96-8p requires the ALJ to describe the maximum amount

of these functions based on the medical evidence which is available in the case record.

"Only after [an assessment of these functions is performed] may the residual functional

capacity be expressed in terms of the exertional levels of work, sedentary, light, medium,

heavy, and very heavy."  SSR 96-8p.

       Without discussing medical evidence pertaining to the plaintiff's limitations or

work-related abilities, the ALJ merely concluded that plaintiff retained the residual

functional capacity for light work.  (Tr. 20).  Rather than discussing why this specific

plaintiff could perform light work, the ALJ gave a general definition of the light work

category:

> Light work involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is in this category when it
> requires a good deal of walking or standing, or when it  involves sitting
> most of the time with some pushing and pulling of arm or leg controls.  To
> be considered capable of performing a full or wide range of light work, an
> individual must have the ability to do substantially all of these activities.
> If someone can do light work, we determine that he can also do sedentary

work, unless there are additional limiting factor such as loss of fine
dexterity or inability to sit for long periods.

(Tr. 20); 20 C.F.R. §§ 404.1567(b) and 416.967(b).

The ALJ's residual functional analysis falls short of what the Social Security

Regulations require.[13]  In assessing compliance with SSR 96-8p, numerous courts have

articulated in their opinions the specific amount of time which a plaintiff could perform

each function during an 8 hour workday.  See e.g. Buchholz v. Barnhart, 98 Fed. Appx

540 at *546 (7th Cir. May 12, 2004) (stating that the ALJ properly found that plaintiff

could sit for six hours and stand or walk for two during an eight hour work day); Prosch

v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000) (concluding that the ALJ properly accepted

the medical assessment of a treating physician who stated that plaintiff could bend, walk

or stand for more than three out of every eight hours).  In the present case, the ALJ did

not specify the amount of time that the plaintiff was able to perform each of the seven

exertional functions during an 8 hour day, particularly those which may be affected by

plaintiff's exertional limitations.[14]  Thus, the ALJ failed to describe the maximum

amount of each work-related activity the plaintiff was able to  perform based on the

evidence available in the case record as required by SSR 96-8p.

On remand, the ALJ should adhere to the requirements outlined in SSR 96-8p in

assessing plaintiff's residual functional capacity.  In particular, the ALJ should cite the

---

[13]  The ALJ is not required to express exhaustive lengthy determinations.  But he must be
precise, if brief, and to the point.

[14]  The seven exertional functions are: sitting, standing, walking, lifting, carrying, pushing, and
pulling.  20 C.F.R. 404.1545, 416.945.  Manipulative or postural functions should also be
discussed by the ALJ when applicable.  Id.

specific medical and nonmedical evidence which he relied upon in making his residual functional capacity determination.  In his determination, ALJ should describe the maximum amount of each work-related activity the plaintiff is able to perform during an 8 hour workday.

**2. The ALJ Properly Assessed Plaintiff's Subjective Complaints.**

Plaintiff argues that the ALJ failed to properly evaluate his subjective complaints. (Pl.'s Br. at 6-7).  In determining plaintiff's capacity for basic work, the ALJ determined "the extent that [plaintiff's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §§404.1529 and 416. 929; SSRs 96-2p and 96-6p; (Tr. 19).  In addition, medical opinions were considered by the ALJ which revealed the nature and severity of plaintiff's impairments and the ensuing limitations. (Tr. 19-20); 20 C.F.R. §§ 404.1527 and 416. 927; SSRs 96-2p and 96-6p.  "[A] plaintiff bears the burden of demonstrating that [his] subjective complaints were substantiated by medical evidence."  Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd per curiam 85 F.3d 611 (3d Cir. 1996)(citation omitted).  In the present case, the relevant medical evidence did not support plaintiff's subjective complaints to the extent that he alleged.

The ALJ is the evaluator of the intensity and the persistence of pain or symptoms and the extent to which they impact the individual's ability to work.  See Hartranft v. Apfel, 181 F.3d 358 (3d Cir. 1987).  The ALJ concluded that plaintiff's subjective complaints were not substantiated by the objective evidence nor any other evidence.  (Tr.

20).  Plaintiff complained of disabling back pain, leg pain and numbness from his hip to his feet.  (Tr. 195).  He alleged that he could sometimes walk two blocks at a time, but other times he could not even straighten out his back.  (Tr. 195, 205).  He claimed that he could sit or stand for only 20 minutes at a time, and could not bend over or lift an object greater than a jug of milk.  (Tr. 205-206).

The medical evidence did not support plaintiff's allegations.  Dr. Augustin noted that plaintiff was able to walk on his heels and toes without the use of a cane and that his lower extremities showed no sensory or motor deficits, nor any edema or varicose veins. (Tr. 145).  Dr. Walsh found that plaintiff could occasionally lift up to fifty pounds, and stand or walk up to six hours.  (Tr. 152).  Dr. Walsh also concurred with Dr. Augustin's conclusions that plaintiff's straight leg raising was to 80 degrees on the right and 75 degrees on the left.  (Tr. 153).  Additionally, Dr. Walsh noted that plaintiff had no neurological deficits and he could walk on his toes and heels.  Id.  Dr. Sawicki observed that plaintiff was able to walk at a reasonable pace without any assistive device.  (Tr. 161, 164).  According to Dr. Sawicki, plaintiff had full muscle strength, pinch strength and grip strength at grade 5/5 each, and his straight leg raising was negative bilaterally. (Tr. 161; see Tr. 164).  Plaintiff had full range of motion in his shoulders, elbows, wrists, feet and ankles.  (Tr. 161; see Tr. 163).

The ALJ also determined that plaintiff's statements about his educational attainment were inconsistent.  (See Tr. 20).  At trial, plaintiff testified that he had only achieved a seventh grade education.  (Tr. 190).  However, in his disability report, he stated that he had attended school through the tenth grade.  (Tr. 64).  Dr. Sawicki noted

**FOR PUBLICATION**                                                    **CLOSED**

that plaintiff had claimed to have a tenth grade education.  (Tr. 205-206).  As a result of these inconsistencies, the ALJ concluded that plaintiff was a less-than-credible witness.

The ALJ provided a sufficient factual foundation for his assessment that plaintiff's testimony was not credible.  See Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D.N.Y. 1983), Boyle v. Harris, 506 F. Supp. 294, 298 (E.D.Pa. 1980).  The ALJ reasonably concluded that plaintiff's subjective complaints of disabling back pain, leg pain, and numbness were not credible.  (Tr. 20, 21).  Plaintiff's contention that the ALJ did not properly evaluate his subjective claims is unfounded.  Accordingly, the ALJ's decision is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion.

**s/ William H. Walls, U.S.D.J.**